Charles R. DEXTER and Mary Agnes
Dexter, Plaintiffs,

v.

UNITED STATES of America,
Defendant.

No. EC 684.

United States District Court
N. D. Mississippi, E. D.

Nov. 25, 1969.

Roland J. Mestayer, Jr., Pascagoula, Miss., and Thomas R. Ward, Meridian, Miss., of Ward, Mestayer & Knight, for plaintiffs.

Jack Warren, Refund Trial Section, U. S. Dept. of Justice, Washington, D. C., H. M. Ray, U. S. Atty., Oxford, Miss., for defendant.

## MEMORANDUM OPINION

ORMA R. SMITH, District Judge.

The case sub judice has been tried to the Court without a jury. It is before the Court for decision on the evidence introduced at the trial, briefs of the parties and argument of counsel.

The pertinent facts are, for the most part, undisputed. The problem comes in determining the inferences to be drawn from the undisputed facts and applying the law to the inferences so drawn.

Mary Agnes Dexter[1] was born January 20, 1917, the child of Mary Alma Smith Pearson and Walter Pearson.[2] Plaintiff married Charles Dexter on April 16, 1933, when she was sixteen

---

1. Mary Agnes Dexter is the principal plaintiff in the case, although her husband, Charles R. Dexter, has joined her in the action. In this opinion she will be referred to as the "Plaintiff".

2. Plaintiff's father, Walter Pearson, will be sometimes referred to in the opinion as "Mr. Pearson".

years of age. Her mother died April 7, 1937. Her father never remarried and died June 19, 1962.

When Plaintiff's mother died she entered into an oral agreement with her father that she and her family would move into the family home and that she would care for him, keep the house, and perform such other services as might be required to provide a home for him and care for his physical needs. In return for the services to be rendered him by his daughter the evidence shows that Plaintiff's father agreed that at his death he would will her the "homeplace" and the "George Seal Place".

Pursuant to the agreement Plaintiff and her family resided at the homeplace of her father, and Plaintiff performed such services as were necessary to carry out her part of the bargain. The arrangement continued for a period of about 25 years until a few weeks before his death, when he moved to the home of his son, Thomas Edward Pearson.

Prior to 1956, Plaintiff's husband rented the farm land on the homeplace from Mr. Pearson. During 1956, Mr. Pearson visited relatives in Texas, and upon his return he had a falling out with his daughter and son-in-law, the details of which are not material to the case sub judice. As a result of the disagreement Mr. Pearson wrote a letter to Plaintiff's husband requesting him to get off of the place and move out of his home. Plaintiff and her family did not move out of the home, although her husband discontinued renting the land from Mr. Pearson.

■ A short time before the letter was sent to Plaintiff's husband, Plaintiff conferred with her attorney about her relationship with her father. Plaintiff related to the attorney the terms of the oral agreement which she had with her father, informed him that she was performing the services which she had contracted to perform, but that her father had become displeased with her husband. Plaintiff sought his advice as to the course she should pursue as she was apprehensive that her father would not carry out his agreement and will her the property, as promised. Plaintiff was advised that there was not anything she could do at the time, since she did not know whether her father had made the will in line with their agreement. She was advised to wait until her father's death, and, if he did not carry out his agreement by will, Plaintiff could probate a claim against his estate for the services which she had rendered to him during his lifetime.[3]

Later, after her husband had received the letter mentioned above, Plaintiff returned to her attorney who advised her

3. In Mississippi it is well settled that an oral agreement to convey land by will or otherwise' is within the statute of frauds,[a] and specific performance of such an agreement cannot be enforced.[b] It is also settled in Mississippi that when parties make an oral agreement that one will care for and render personal services to the other and that the latter will make compensation therefor by way of a will to the former, and the will is not made, the party who has rendered the care and performed the services under such an agreement may recover therefor on the quantum meruit.[c]

The statute of limitations[d] does not apply to such a claim because the cause of action does not accrue to the claimant until after the death of the promisor, who agrees to pay for such services in his will and breaches it by failing to do so.[e]

a. § 264, Miss.Code 1942, Annotated, Recompiled.

b. Collins' Estate v. Dunn, 233 Miss. 636, 103 So.2d 425, 430; Ellis v. Berry, 1926, 145 Miss. 652, 110 So. 211.

c. First National Bank v. Owen, 1936, 177 Miss. 339, 171 So. 4, 6; Ellis v. Berry, supra; Collins' Estate v. Dunn, supra; Hickman v. Slough, 187 Miss. 525, 193 So. 443; In re Estate of Whittington, Deceased, 217 Miss. 457, 64 So.2d 580.

d. § 729, Miss.Code 1942, Annotated, Recompiled.

e. Ellis v. Berry, supra; Carter v. Witherspoon, 1930, 156 Miss. 597, 126 So. 388; In re Whittington's Estate, 1953, 217 Miss. 457, 64 So.2d 580.

that she and her husband should stay in the home, but surrender the rest of the property, and that she should be in a position to prove that she had performed the services to her father, as provided in the agreement.

During 1956 and 1957 Plaintiff and her husband experienced an estranged relationship with her father, and in 1957 Plaintiff asked her father if he was going to honor his agreement with her, to which he replied "you will have to wait and see". Except for this interlude a good relationship existed between Plaintiff and her father from the death of Plaintiff's mother until a short time before his death when he moved from the homeplace to the home of his son.

Mr. Pearson, about two or three weeks before his death, left his home and moved into the home of his son, Thomas E. Pearson, where he resided until his death. Plaintiff and Thomas E. Pearson were the only children of Mr. Pearson.

On June 5, 1962, shortly after moving into the home of his son, Mr. Pearson visited the office of his attorney in Houston, Mississippi, and engaged his services to write a will for him to execute. After counseling with his attorney, Mr. Pearson executed two deeds. By one deed he conveyed the homeplace, consisting of 240 acres, to his daughter, the Plaintiff herein. By the other he conveyed 140 acres of land to his said son. The deed conveying the homeplace to Plaintiff, recited the consideration for the deed to be "For and in consideration of the sum of Ten and No/100 Dollars, and for the love and affection that I have and bear toward my daughter, the grantee herein named, I, Walter Pearson, do hereby convey and warrant unto Mary Agnes Dexter". The deed by which Mr. Pearson conveyed the 140 acres of land to his son, contained a recitation of the consideration for the conveyance similar to the one contained in the deed to his daughter, except for the substitution of the son as the grantee.

These deeds were dated and acknowledged on June 5, 1962. As mentioned above, Mr. Pearson died June 19, 1962. The deed to Plaintiff was filed for record and recorded in the land records of the county on June 22, 1962, and the deed to Mr. Pearson's son was filed for record and recorded in the land records of the county on July 27, 1962. The deed to Plaintiff was delivered to her by her brother after the death of Mr. Pearson.

On his visit to his attorney's office on June 5, 1962, Mr. Pearson requested him to prepare a will for him to execute. This was done, and the will was executed on that date.

The provisions of the will essential to consider in the determination of the issues involved in the case sub judice are:

"Item II: I give and bequeath unto my daughter, Mrs. Mary Agnes Dexter all of my household furnishings now in her home on the land which constituted my home place, I having this day made her a deed to said land, being a deed of gift. I also give and bequeath unto my daughter, Mrs. Mary Agnes Dexter an undivided one-fourth interest in all oil, gas and minerals in, upon and under the following described land, to-wit: Southwest ¼ of Section 10, less 14.5 acres, more or less lying South and West of Long Creek; 2 acres in Southwest corner of the Northeast ¼ of Section 10; and 5 acres in the Northwest corner of the Southeast ¼ of Section 10; all in Township 14, Range 4 East, in Chickasaw County, Mississippi.

Item III: The balance of my properties of every kind and description and wheresoever the same may be situated I do hereby give, devise and bequeath unto my son, Thomas E. Pearson and his wife, Mary Emma Pearson, subject only to the payment of the administration costs of administering my estate."

During his lifetime, and on April 14, 1949, Mr. Pearson executed and delivered to Plaintiff a deed by which he conveyed to her 110 acres of land in Chickasaw County, Mississippi. The

deed recited a consideration of One Dollar cash in hand paid, and the love and affection which Mr. Pearson held for Plaintiff. The recital in the deed in regard to the consideration therefor, is similar to the one contained in the deed by which Mr. Pearson conveyed the homeplace to Plaintiff, mentioned above.

A short time before his death Mr. Pearson sold the "George Seal Place", thereby making it impossible for him to will the place to Plaintiff, pursuant to the agreement aforementioned. The place was sold on a credit and at the time of Mr. Pearson's death he held purchase money notes on the farm in excess of $60,000.00.

The will executed by Mr. Pearson was duly admitted to probate and Letters Testamentary issued thereon. Plaintiff probated a claim against the estate for services rendered decedent during his lifetime pursuant to the aforesaid agreement. The claim was predicated on 25 years services at $2,000.00 per year, amounting to a gross amount of $50,000.-00. Against this total figure Plaintiff credits the sum of $24,000.00, recognizing the conveyance to her of the homeplace. The homeplace was valued at $100.00 per acre. The amount claimed on the probate was $26,000.00.[4]

It is shown in the statement of account that the "George Seal Place", consists of 150 acres, which Plaintiff valued at $150.00 per acre. The record shows that the residue of the estate, passing under the will to the son, contained a promissory note for $90,858.05, payable in annual installments over a 19 year period, commencing December 15, 1962, given to Mr. Pearson for the purchase money of 472.5 acres of land. It is evident that the transaction represented by this note included the "George Seal Place".

Plaintiff settled her claim against her father's estate for $12,000.00. The money in settlement of the claim was received by her in 1964, and she included it in the income tax return for 1964, filed jointly by Plaintiff and her husband.

Defendant contends that the homeplace conveyed to Plaintiff by her father's deed in 1962 constitutes taxable income under the Internal Revenue Laws, and has assessed her with income taxes, penalties and interest, with respect to the taxable year ending Decem-

4. Plaintiff's statement of account, attached to the affidavit of probate of claim or account is as follows:

"January 4, 1963

MARY AGNES DEXTER
IN ACCOUNT WITH WALTER PEARSON

To services rendered Walter Pearson, in providing for his physical needs, preparing and serving meals, washing, ironing and mending his clothes, nursing him when sick and living with him in his home from April 8, 1937 to his death in June 1962, more than twenty-five (25) years, all pursuant to a contract to pay or reimburse claimant therefor by leaving to her the 'Home Place' consisting of 240 acres with a value at testators death of Twenty Four Thousand Dollars ($24,000.00) and the 'George Seal Place' consisting of 152 acres and valued at testators death at $150.00 per acre, and breached at the death of testator when he left or deeded a few days before his death to your claimant the 'Home Place' and did not leave the 'George Seal Place' or its value to your claimant.

25 years at $2,000.00 per year......................$50,000.00
 Less the 'Home Place' 240 acres
 at $100.00 per acre................................. 24,000.00

 BALANCE OWING...................$26,000.00"

ber 31, 1962, totaling $22,557.51.[5] This assessment was made on July 21, 1967. Plaintiff paid this amount to the District Director on June 9, 1967 ($21,925.92) and October 25, 1967 ($631.59). Plaintiff and her husband seek to recover said total amount with statutory interest as taxes erroneously assessed and collected by defendant.

Defendant placed a value of $32,400.00 upon the homeplace in making the assessment for income taxes due and payable by plaintiff.

Plaintiff owned some farm land in her own right during the taxable year 1962.

Crops were grown on this land and the fair inference from the evidence is that the work necessary to cultivate and harvest the crops was performed by or under the direction of the husband of Plaintiff. One income tax return was filed for 1962. It was prepared by a third party, who was engaged in the business of preparing income tax returns for others.

Plaintiff assisted her husband in gathering the information necessary to be obtained in order for the return to be made by the accountant. The Schedule of Farm Income and Expenses (Schedule F

---

5. The pertinent parts of the several sections of the Internal Revenue Code of 1954, and Treasury regulations in regard thereto, applicable to the case sub judice are:

Internal Revenue Code of 1954:
"§ 61. Gross income defined.

(a) *General definition.*—Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items:

(1) Compensation for services, including fees, commissions, and similar items;

\* \* \* \* \*

(26 U.S.C.1964 ed., Sec. 61.)

SEC. 6012. Persons required to make returns of income.

(a) *General rule.*—Returns with respect to income taxes under subtitle A shall be made by the following:

(1) Every individual having for the taxable year a gross income of $600 or more (except that any individual who has attained the age of 65 before the close of his taxable year shall be required to make a return only if he has for the taxable year a gross income of $1,200 or more);

\* \* \* \* \*

(26 U.S.C.1964 ed., Sec. 6012.)

SEC. 6651. Failure to file tax return.

(a) *Addition to the tax.*—In case of failure to file any return required under authority of subchapter A of chapter 61 (other than part III thereof), \* \* \* on the date prescribed therefor (determined with regard to any extension of time for filing), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues not exceeding 25 percent in the aggregate.

\* \* \* \* \*

(26 U.S.C.1964 ed., Sec. 6651.)

SEC. 6653. Failure to pay tax.

(a) *Negligence or intentional disregard of rules and regulations with respect to income or gift taxes.*—If any part of any underpayment (as defined in subsection (c) (1)) of any tax imposed by subtitle A or by chapter 12 of subtitle B (relating to income taxes and gift taxes) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment.

\* \* \* \* \*

(26 U.S.C.1964 ed., Sec. 6653.)

Treasury Regulations on Income Tax (1954 Code):

Sec. 1.61–2. Compensation for services, including fees, commissions, and similar items.

\* \* \* \* \*

(d) *Compensation paid other than in cash*—(1) *In general.* If services are paid for other than in money, the fair market value of the property or services were rendered at a stipulated price, such price will be presumed to be the fair market value of the compensation received in the absence of evidence to the contrary. However, for special rules relating to certain options received as compensation, see Sec. 1.61–15 and section 421 and the regulations thereunder."

—Form 1040) attached to the return included the proceeds of the sale of all crops grown on Plaintiff's land and all expenses attributable to the farm operation. The expenses included, inter alia, items related to farm ownership such as taxes, costs of repairs to buildings, insurance, depreciation of houses and barns, etc.

The net income from farm operations, shown on the return, amounting to $3,893.08, was carried forward by the accountant to Schedule F–1 (Form 1040) Computation of Social Security Self Employment Tax on Farm Earnings (For Social Security) for the benefit of Plaintiff's husband. Social Security taxes on this amount were paid for his account as the self-employed person entitled to credit therefor.

Other than income from the farm, the only income of any consequence shown on the return is the sum of $428.58, realized from interest charged and collected on the account of tenants (a farm related item).

Included in the itemized deductions shown on the return were items attributable to both husband and wife. For example, Plaintiff's contribution to her church was listed, as were numerous items of medical expense paid by plaintiff for medication and hospitalization.

The return contained all items of income and expenses, as well as deductions, for the year, of husband and wife, except the income attributable to conveyance of the homeplace to plaintiff if such conveyance constitutes an item of taxable income for the year.

The return, however, shows the taxpayer to be the husband. The return is signed only by the husband. It is not signed by Plaintiff, and her name does not appear thereon. The return is designated as one filed by the taxpayer who is married and filing a separate return. It indicates that a separate return is not filed by the wife. The occupation of the taxpayer is shown to be that of a "farmer".

■ The evidence introduced with regard to the 1962 value of the homeplace ranged from the $20,152.00 value placed on the property by Plaintiff's witness, Moore, to the value of $28,375.00 placed thereon by the defense witness, Collins. As the Chief Justice Smith, of the Mississippi Supreme Court said in Mississippi State Highway Commission v. Hillman, 1940, 189 Miss. 850, 198 So. 565, 570, "Land has no market value, in the sense that stocks, bonds, and other public securities have a market value, or even as the common and ordinary articles of commerce have such market value". So it is in the case sub judice. The value placed upon the property by the expert witnesses is the appraisal of each as to the true market value thereof. Neither of them can be absolutely positive as to the exact value in dollars and cents. The Court must consider the background and experience of each witness, and come to its own conclusion.

In preparing for the trial of the case sub judice plaintiffs arranged to take the discovery deposition of the attorney who prepared the deeds and will for Mr. Pearson on June 5, 1962. The deposition was taken on July 17, 1968. Both parties participated in taking the deposition. A certified copy of the deposition was properly filed with the Clerk.

On the hearing before the Court, defendant offered the attorney as a witness in the case. Plaintiffs objected to the testimony on the ground that the attorney could not testify as to the facts surrounding the preparation and execution of the deeds and will because of the attorney-client relationship existing between him and Mr. Pearson, his client.

■ The Court reserved its ruling as to the competency of this evidence and received the same subject to Plaintiffs' objection. The testimony of this witness is material to the main issue involved in this case, that is whether the land conveyed by the deed executed and delivered to plaintiff constituted a gift, as stated in the deed and in the will, or whether the conveyance constituted pay-

ment to Plaintiff for services rendered Mr. Pearson during his lifetime, pursuant to the oral contract above mentioned.

The issue thus presented to the Court is to be solved by applying the Mississippi law on the subject. Baird v. Koerner, 1960, 9 Cir., 279 F.2d 623, 632, 95 A.L.R. 303. The only statute in Mississippi on the subject is § 8665(4), Miss. Code, 1942, Ann., Recompiled, which provides: "It is the duty of attorneys * * (4) To maintain inviolate the confidence and, at every peril to themselves, to preserve the secrets of their clients".

The Mississippi Supreme Court considered this statute in the case of McCaslin v. Willis, 1944, 197 Miss. 366, 19 So.2d 751, 156 A.L.R. 770, and said, as follows:

"We have no privileged communications statute as to attorney and client, other than section 8665, Code 1942, which requires attorneys 'to maintain inviolate the confidence and, at every peril to themselves, to preserve the secrets of their clients.' In other words, we have no statute regarding privileged communications between attorney and client which expressly provides that a disclosure cannot be made except with the consent of the client, as is true under section 1697, Code 1942, supra, relating to those between a physician and patient, which was before the Court as aforesaid in the case of McCaw v. Turner, supra. At any rate, we are of the opinion that under the rule stated in 20 Am.Jur. p. 521, hereinbefore quoted, the witness, even though occupying the relation of an attorney for Mr. McCaslin as well as that of a trustee in the deed of trust, was competent to testify under the circumstances to refute the contention when made that said deceased had made the alleged statement against interest that the debt had been paid." (19 So.2d p. 754.)

The rule stated in 20 Am.Jur. page 521, to which reference is made in the opinion in *McCaslin*, is carried forward in 29 Am.Jur.2d, Evidence, § 674, page 728, and is as follows:

"In the absence of statute, the death of a declarant is not in itself a ground for invoking an exception to the hearsay rule, which renders unsworn statements inadmissible in evidence. Under certain circumstances, however, statements made by a person since deceased are admissible under an exception to such rule, based on the ground of necessity.

\* \* \* \* \* \*

"On principle, such declarations are not admitted as of necessity if other competent evidence is available."

Another Mississippi case in which reference is made to the attorney-client relationship is the case of Smith v. Smith, 1939, 185 Miss. 702, 188 So. 305. In this case the court said:

"All of the business of the testator had been transacted under powers of attorney in favor of the contestant and Torrey Smith during his illness, and by means of other documents executed by mark made by the attorney and witnessed by him and one or the other of the two sons. To establish testamentary capacity during the period in question, the attorney was offered as a witness, and although objections to his testimony were repeatedly sustained by the court and the rule correctly announced to the effect that he was not competent to relate any facts or circumstances about which he was advised in a professional capacity, it appears that one transaction after another, including the circumstances under which the instrument in question was prepared and submitted for approval in advance, were inquired into to the extent that the jury became acquainted with a number of transactions concerning which such testimony was privileged. These inquiries should not have been made in the presence of the jury. The competency of the witness as to each of the transactions to be inquired into should have been ascertained in ad-

vance, before they were brought to the knowledge of the jury."

It should be noted that the question of the admissibility of evidence relating to facts obtained by an attorney from his client is an attorney-client relationship was not before the Court for decision in *Smith*. The lower court excluded the evidence and the Supreme Court, commenting thereon, said the lower court applied the correct rule to the effect that the attorney was not competent to relate facts or circumstances about which he was advised in a professional capacity. This point was not at issue in the case, but formed the background for the holding that the lower court should have inquired into the competency of the witness as to each transaction in advance before the details of each were brought to the knowledge of the jury. This was not done by the lower court. The opinion in *Smith*, therefore, lacks the force of adjudication on this point, and is obiter dictum.

■ One of the contentions of defendant is, assuming arguendo the testimony of the attorney is privileged, that plaintiffs waived this privilege by taking the discovery deposition of the attorney. This contention is without merit. Rule 26(f) of the Rules of Civil Procedure provide: "A party shall not be deemed to make a person his own witness for any purpose by taking his deposition". In the case of Duling v. Markun, 1956, 7 Cir., 231 F.2d 833, the court had under consideration the identical point raised by defendant in this case. *Duling* involved the Indiana Deadman's Statute under which defendant *Markun* would be incompetent to testify. The Court was confronted with the question of waiver of the incompetency by the taking of the discovery deposition of *Markun*. The court held that a waiver should not result from the mere taking of a discovery deposition under the Federal Rules.[6]

The Court must, therefore, consider and determine the question of the competency of the testimony of this witness. The record is completely silent on the issue of the intention of Mr. Pearson in making the deeds and the will, except for the language used in the documents. The evidence reflects that the attorney represented Mr. Pearson for many years and counseled with him on many occasions. There is absolutely no reason for the attorney to color the evidence in any way regarding the circumstances surrounding the execution of the will and the deeds. In search for the truth in this case it is essential for the Court to consider this testimony. If the contention of plaintiff that the deed was a deed of gift and not a transfer of prop-

6. In *Duling*, supra, the court said:

"The question comes down to this. Under Federal Rules of Civil Procedure, plaintiffs were entitled to conduct a discovery examination and take the deposition of defendant Markun. A proceeding by discovery was particularly appropriate in view of Markun's unwillingness to disclose to the executors the nature of the transaction involving the two $25,000 checks. Plaintiffs did not offer the deposition in evidence. There was no intentional relinquishment on their part of their right to raise the objection as to the competency of Markun to testify. We do not think that a litigant in Federal Court must either refrain from taking advantage of the Federal Rules pertaining to discovery or to proceed to do so at his peril because, under state law, in a state court proceeding, the taking of a deposition is considered a waiver.

"The Federal Rules themselves indicate that a waiver should not result from the mere taking of a discovery examination. Rule 26(f) provides, in substance, that a party shall not be deemed to make a person his own witness for any purpose by taking his deposition. ‘ * * * The purpose of the first sentence of Rule 26 (f) is to make it perfectly clear that by merely taking a deposition before trial a party does not impose restrictions upon himself with respect to the deponent at the actual trial.’ Anderson v. Benson, D.C., 117 F.Supp. 765, 771.

"We hold plaintiffs did not waive their right to object at the trial that defendant Markun was incompetent to testify as to conversations and transactions with Jack Marks, now deceased, concerning the transfer of the two $25,000 checks to him."

erty in payment of an obligation is to be refuted, it is necessary that the testimony of this witness be received and considered along with the other evidence in the case. The case sub judice in the Court's opinion, comes within the principle enunciated by the Supreme Court in *McCaslin*. Plaintiff's objection to this evidence will be overruled.

The attorney testified as to the circumstances surrounding the execution of the will and deeds. It appears that on the date above mentioned, Mr. Pearson came to the attorney's office and requested the attorney to prepare a will for him whereby the homeplace would be left to his daughter and the balance of his estate left to his son.

In the discussion which followed, the attorney advised Mr. Pearson with regard to the tax benefits to be derived in making gifts to his children, and removing the property subject to the gift, from his estate. At the suggestion of the attorney the two deeds and will aforementioned were prepared for execution by Mr. Pearson. The will was later executed in the presence of other witnesses, and the deeds duly acknowledged before a Notary Public.

The attorney testified that the language used in the deeds describing the consideration for their execution and the language contained in the will concerning the deed to the daughter, were not suggested by Mr. Pearson, but were selected by him, as the draftsman of the documents, to carry out the plan desired by Mr. Pearson for disposition of his estate.

The attorney read the documents to Mr. Pearson and reviewed them with him before they were executed.

In the conference with the attorney, in discussing the disposition to be made of his property by will, Mr. Pearson commented on his reasons for leaving the homeplace to his daughter. Mr. Pearson said that he would not leave the property to her if he hadn't promised it to her.[7]

■ At the hearing the Court reserved rulings on two other matters. Plaintiffs offered in evidence the deed executed by Mr. Pearson on June 5, 1962, by which he conveyed his son, the place at which the son then made his home. This deed was one of the two deeds executed by Mr. Pearson when he made his will. The other deed forms the basis for this litigation, and was received in evidence by the court at the hearing. The will was also received in evidence. The basis of objection by defendant is that the deed was not material to the issues before the court. The Court believes the deed is relevant and material in the case. The objection will be overruled, and the deed admitted into evidence for the Court's consideration in reaching a decision.

■ The other matter pertains to the discovery deposition of Plaintiff taken by defendant. The deposition was properly filed with the Clerk and was used by defendant in the cross-examination of Plaintiff. Defendant offered in evidence pages 1 through 30, and the first two lines on page 31 of the depo-

7. The colloquy between Mr. Pearson and the attorney regarding this matter is related by the attorney in his testimony as follows:

"Q. (Continuing) Did Mr. Pearson state to you why he was leaving his home place to Mary Agnes Dexter?

A. No, sir. He didn't go into any detail about it.

Q. Did he make any statement at all concerning his motives?

A. He just said, 'I wouldn't leave her that if I hadn't promised it to her.' That was all, but that was with reference to the preparation of the will.

Then was when I advised him to, maybe go ahead and get, make a deed to her to get it out of his estate.

Q. You say that he stated that he wouldn't give it to her if he hadn't promised it to her?

A. 'I wouldn't give her that if I hadn't promised it to her.' That is exactly what he said. I didn't ask him why.

Q. Did he elaborate on his statement?

A. No, sir."

sition. The Court is of the opinion that the deposition of a party may be used by an adverse party for any purpose.[8] The objection will be overruled.

The first and foremost issue to be decided by the Court is whether the transfer of the homeplace by Mr. Pearson to Plaintiff was a gift or a conveyance to compensate Plaintiff for her services to him during his lifetime.

 As the Court reviews the evidence, it should be borne in mind that the determination of tax and the assessment thereof by the Commissioner were presumptively correct. The Plaintiffs have the burden of proving that they were overtaxed. Mersel, Etc. v. U. S. A., 5 Cir., 420 F.2d 517, decided October 2, 1969.[9]

Thus, we begin with the premise that the conveyance of the homeplace to the Plaintiff by her father constituted income to Plaintiff in the year of the conveyance, having been made to compensate Plaintiff for services rendered pursuant to the oral agreement.

The evidence is abundant that Plaintiff expected her father to transfer to her the homeplace at his death via his will; and that this transfer would be in payment of services rendered pursuant to the oral agreement which she had with her father 25 years before his death. The evidence is also clear that she asserted at all times the obligation of her father to compensate her for her services by leaving her the homeplace and the "George Seal Place". The Court finds no difficulty in arriving at this conclusion. The intention of the father presents another question and the solution is more difficult.

The question whether a specific transfer to a taxpayer in fact amounts to a "gift" within the meaning of the statute, was considered in depth by the Supreme Court in Commissioner of Internal Revenue v. Duberstein, 1960, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218. The opinion related to two cases pending before the Court.[10] Each case involved the same legal question. The Court dealt with both cases in a single opinion.

The government suggested that the Court promulgate a new "test" in the area to serve as a standard to be applied by the lower courts and by the Tax Court in dealing with the numerous cases that arise. The Court rejected the invitation, stating "We are of the opinion that the governing principles are necessarily general and have already been spelled out in the opinions of this Court, and that the problem is one which, under the present statutory framework, does not lend itself to any more definitive statement that would produce a talisman for the solution of concrete cases". Commissioner v. Duberstein, supra, at 363 U.S. page 284, at 80 S.Ct. page 1196, at 4 L.Ed.2d page 1224.

In *Duberstein* the court quoted, with approval, from Bogardus v. Commissioner of Internal Revenue, 302 U.S. 34, 43, 58 S.Ct. 61, 82 L.Ed. 32, 38, saying "And in this regard, the most critical consideration, as the Court was agreed in the leading case here, is the transferor's 'intention'. * * * What controls is the intention with which payment, however voluntarily, has been made." 363 U.S. page 285, 80 S.Ct. page 1197, 4 L.Ed.2d page 1225.

---

8. Rule 26(d) (2) of the Federal Rules of Civil Procedure provides:
 "(2) The deposition of a party or of any one who at the time of taking the deposition was an officer, director, or managing agent of a public or private corporation, partnership, or association which is a party may be used by an adverse party for any purpose."

9. *Mersel* cited authorities to sustain this rule of law as follows:

"Mertens, Federal Income Taxation, Sec. 58A. 35 (rev. edition 1965); Helvering v. Taylor, 293 U.S. 507, 514, 55 S.Ct. 287, 79 L.Ed. 623 (1935); Veino v. Fahs, 5 Cir. 1955, 257 F.2d 364, 367; Akers v. Scoffield, 5 Cir. 1948, 167 F.2d 718, 720, certiorari denied 1948, 335 U.S. 823, 69 S.Ct. 47, 93 L.Ed. 378."

10. No. 376—Commissioner v. Duberstein, and No. 546, Stanton v. United States.

It is thus urged upon the Court in the case sub judice that the intention of the decedent, Pearson, is the critical and controlling point in the case. With this the Court agrees. However, in determining Pearson's intention at the time of the transfer, the Court cannot accept or consider as conclusive the language used in the deed and will, indicating the transfer to be a gift. Pearson's intention must be determined by a consideration of all evidence in the case bearing on the subject. Commissioner v. Duberstein, supra.[11]

Thus, it is clear, that the Court's duty in the case sub judice, is to consider all relevant facts in the case, in order to determine whether the transfer of the "homeplace" by Mr. Pearson to Plaintiff was in fact a gift, as stated in the deed, or, a transfer of property in payment of an obligation, as contended by defendant. The evidence shows that Mr. Pearson entered into an oral agreement with his daughter to compensate her for her services by providing in his will that she receive the homeplace and the "George Seal Place". Mr. Pearson conveyed by deed to Plaintiff in April 1949 a tract of land consisting of 110 acres. Whether Mr. Pearson meant this conveyance to take the place of the "George Seal Place" cannot be ascertained from the evidence in the case.

When called upon in 1956 or 1957 to reaffirm his oral agreement Mr. Pearson informed Plaintiff that she would have to await his death to find out if he complied with the agreement.

Mr. Pearson abandoned his homeplace where he resided with Plaintiff shortly before his death. He immediately contacted his attorney and requested that a will be prepared for him. Mr. Pearson devised and bequeathed the great bulk of his estate to his son, with whom he had never lived, except for about two weeks before his death. In discussing the preparation of his will with his attorney Mr. Pearson informed the attorney that he would not leave the homeplace to his daughter if he had not promised it to her.

Taking into consideration all of the evidence in the case, the proof, in the opinion of the Court, is not sufficient to overcome the presumption that the determination of tax and the assessment thereof by the Commissioner were correct. In other words, the Court cannot find from the evidence that the transfer of the homeplace by Mr. Pearson to plaintiff, as evidenced by the deed above mentioned, constituted a gift or that the transfer was not made pursuant to his oral agreement with Plaintiff and in payment of services rendered by her.

The Court, having determined the transfer of the homeplace to Plaintiff by her father was not a gift, but a transfer of property in payment of services rendered by Plaintiff, must now determine the fair market value of the homeplace on the date of transfer, June 5, 1962. The Commissioner fixed the value of the property as $32,400.00. Plaintiff contends the value to have been $24,000.00. The evidence on the issue

---

11. In *Duberstein,* the court said:

"The Government says that this 'intention' of the transferor cannot mean what the cases on the common-law concept of gift call 'donative intent.' With that we are in agreement, for our decisions fully support this. Moreover, the Bogardus case itself makes it plain that the donor's characterization of his action is not determinative—that there must be an objective inquiry as to whether what is called a gift amounts to it in reality. 302 U.S., at 40 [58 S.Ct., at 64]." (363 U.S. 286, 80 S.Ct. 1197, 4 L.Ed. 1225.)

"Decision of the issue presented in these cases must be based ultimately on the application of the fact-finding tribunal's experience with the mainsprings of human conduct to the totality of the facts of each case." (363 U.S. 289, 80 S.Ct. 1198, 4 L.Ed. 1227.)

"It seems to us plain that as trier of the facts it was warranted in concluding that despite the characterization of the transfer of the Cadillac by the parties and the absence of any obligation, even of a moral nature, to make it, it was at bottom a recompense for Duberstein's past services, or an inducement for him to be of further service in the future." (363 U.S. 291, 80 S.Ct. 1200, 4 L.Ed. 1228.)

ranges from a low valuation of $20,152.00 to a high valuation of $28,375.00. As stated by the court in *Hillman,* supra, "land has no market value, in the sense that stocks, bonds, and other public securities have a market value, or even as the common and ordinary articles of commerce have such market value". The Court, after considering the evidence in the case, is of the opinion and so finds that the homeplace at the time of the transfer had a fair market value of $24,000.00.

The next question for the Court's determination is whether Plaintiff and her husband filed a joint Federal Income Tax Return for the calendar year 1962. The return, on its face, indicates that it is the separate return of the husband. The return is not signed by the wife. The evidence reflects that Plaintiff gathered some, if not all, of the factual information needed by the accountant to prepare the return. The return included all income of husband and wife for the year, except for the property conveyed to the wife by the deed aforesaid. The income reflected by the return originated in the operation of farm land, some of which, at least, was owned by Plaintiff. The farm expenses were listed and deductions of both husband and wife were taken. The accountant, while not a certified public accountant, was a former employee of the State Tax Commission, and was engaged regularly in the business of preparing tax returns for other people. Plaintiff knew that a person having a yearly income of $600.00 or more was required to file an income tax return. She testified that she did not file a separate return for the year in question, that the return filed by her husband, which she did not sign, included all items of income and deductions for both of them and that she considers it to be a joint return. Plaintiff filed a joint return with her husband for the calendar year 1964. She did not file a federal income tax return before that time.

The only basis upon which the Court can find that the 1962 tax return filed by Plaintiff's husband is in fact a joint return must be found in the evidence that all income and disbursements of the husband and wife, other than the property conveyed to Plaintiff by her father, are included in the return. All other evidence in the record points in the opposite direction.

The treasury regulations provide that a joint return must be signed by the husband and wife.[12] Regardless of this clear provision, returns signed by one spouse in numerous cases have been held to be joint returns, where all income and disbursements of husband and wife are included in the return.

■■■■■ A return which reports all gross income produced by and accruing to both husband and wife may be a joint return even though it is signed merely by the husband. Vol. 8A Mertens' Law of Federal Income Taxation § 47.09, page 23. Although it may not be conclusive, the inclusion in the return of income and deduction items of the wife has been regarded as a factor supporting the conclusion that the return was the joint return of husband and wife, Vol. 8A Mertens' Law of Federal Income Taxation § 47.09, page 24. There can be a binding joint return even though one of the spouses failed to sign the return. Heim v. Commissioner of Internal Revenue, 1958, 8 Cir., 251 F.2d 44, 45. The question of whether or not a joint return has been filed is a factual question, the answer to which rests upon a determination of the intent of the taxpayers. Heim v. Commissioner of Internal Revenue, supra, page 46; Jones v. Commissioner, 1964, 4 Cir., 327 F.2d 98, 101. The mere circumstance that the husband includes both his own income and that of his wife in his return will not establish per se that the return is a joint return. McCord v. Granger, 1952, 3 Cir., 201 F.2d 103, 106.

12. Mertens' Law of Federal Income Taxation, 1954–60 Regulations (§ 6013) § 1.6013–1(a) (2) provides:

"A joint return by a husband and wife if not made by an agent shall be signed by both spouses."

It is clear to the Court that Plaintiff did not intend to file an income tax return for the calendar year 1962. Under such circumstance, the Court cannot hold that Plaintiff intended to file a joint return with her husband.

This brings the Court to a consideration of the reason why Plaintiff did not file a return for 1962 and include therein the fair market value of the property received by her from her father as gross income.

The solution of this problem will determine whether the Commissioner correctly assessed Plaintiff with penalties under § 6651(a) and § 6653(a) of the Internal Revenue Code of 1954. The first section provides for a penalty for failure to file a return where such failure is due to wilful neglect and not to reasonable cause, and the latter provides for a penalty for underpayment of income tax, where such underpayment is due to negligence or intentional disregard of rules and regulations.

If Plaintiff failed to file a return and include therein the fair value of the homeplace, as the result of reasonable cause, and without any intent to evade the tax and disregard the rules and regulations of the Treasury Department she would not be liable for either penalty.

The record shows and the Court finds that Plaintiff is a person of limited education and business acumen. She and her husband lived on a small farm, where she performed the household duties and he superintended limited farming operations. The small income of the family derived principally from the farm owned by Plaintiff was reported annually on a separate return of the husband. The deductions of the family were included in the yearly returns. Plaintiff assisted in the preparation of the figures and secured other information from which an accountant prepared the annual return. The accountant was a person skilled in tax work, having been, at one time, in the employment of the State Tax Commission, and operating a public business engaged in the preparation of tax returns for others. Plaintiff understood that a person having an income of at least $600.00 was required to file a return, but she did not believe that she had such an income for 1962—hence, Plaintiff was under the impression that it was not necessary for her to file a return or sign the return with her husband.

During the time involved Plaintiff secured and utilized the services of an able and distinguished member of the Bar to advise, counsel, and represent her in the matter of her claim against her father, or his estate.

Shortly after her father's death in 1962, Plaintiff's brother delivered to her a deed by which her father conveyed to her the homeplace. The deed recited that it was made for a nominal consideration and the love and affection which her father held for her. In the will her father referred to the deed as a deed of gift. In January 1963, before the due date of the 1962 return, Plaintiff's attorney advised her that the conveyance of the homeplace was a gift on the part of her father; but, in presenting the claim against the estate of her father, a court of equity required the value of the homeplace to be credited against the total demand.

The Court has held that the conveyance was not a gift, but extensive litigation has intervened. Plaintiff cannot be held to the same strict accountability as a person well trained and experienced in business affairs or as one skilled in legal matters.

It appears to the Court that Plaintiff, under the circumstances involved, acted upon reasonable cause, and not with wilful neglect in failing to file the return in question, and that the underpayment of income tax, or rather the failure to pay any tax, because Plaintiff did make a return and included therein the fair market value of the property transferred to her on June 5, 1962, was not due to negligence or intentional disregard of rules and regulations.

This holding of the Court is supported by numerous well reasoned decisions of the courts. Miller v. United States, U.S. D.C., D. Wyoming, 1962, 211 F.Supp. 758; Orient Investment & Finance Co., Inc. v. Commissioner, 1948, District of Columbia Cir., 83 U.S.App.D.C. 74, 166 F.2d 601, 3 A.L.R.2d 612; Haywood Lumber & Mining Co. v. Commissioner, 1950, 2 Cir., 178 F.2d 769.

## ULTIMATE FINDING OF FACTS

In sum, the Court finds:

(1) That the property transferred by deed to Plaintiff by her father on June 5, 1962, constituted compensation for services rendered by Plaintiff and did not constitute a gift, within the meaning of the Internal Revenue laws of the United States;

(2) That on the date of the transfer, June 5, 1962, the fair market value of the property transferred to Plaintiff was $24,000.00, and this sum, undiminished by any amount, is includable in her gross income for 1962;

(3) That Plaintiff did not file a joint income tax return with her husband for the calendar year 1962;

(4) That Plaintiff failed to file an income tax return for 1962, but such failure was due to reasonable cause and not to wilful neglect;

(5) That the failure of Plaintiff to pay any income tax for the year 1962, and the underpayment of tax occasioned thereby, resulting from her failure to report as gross income the fair market value of the property transferred to her on June 5, 1962, was not due to negligence or intentional disregard of rules and regulations; and

(6) That the taxes were assessed against Plaintiff, Mary Agnes Dexter, and not against her and her husband.

## CONCLUSIONS OF LAW

The Court holds:

(1) That the fair market value of the homeplace, on June 5, 1962, in the sum of $24,000.00, is includable in the gross income for income tax purposes of Plaintiff, Mary Agnes Dexter, for the year 1962;

(2) That Plaintiff owes such income taxes as may be due on account of inclusion of the said sum of $24,000.00 in her gross income for the calendar year 1962, with six percent (6%) interest from April 15, 1963, but Plaintiff does not owe penalties of any nature on account of failure to file a timely return, and/or underpayment of taxes for said year; and

(3) That Plaintiff, Mary Agnes Dexter, is entitled to recover from defendant with statutory interest from date of payment, the amount paid by her to defendant amounting to $22,557.51 (on June 9, 1967—$21,925.92, and on October 25, 1967—$631.59), less such amount as may have been due by her for income taxes, with interest, computed on her gross income for 1962 adjusted by the addition of the said sum of $24,000.00.

Counsel for the parties are directed to calculate the amount of the recovery to which Plaintiff is entitled, pursuant to the provisions of this opinion, within fifteen (15) days from the date hereof and submit such calculation to the Court for entry of a final judgment. In the event counsel cannot agree as to the amount, within the time aforesaid, counsel for each party will submit calculations, and the underlying reasons therefor, for the information and convenience of the Court in arriving at the correct amount for which recovery shall be made.